**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION**

| | | |
|---|---|---|
| CSP TECHNOLOGIES, INC., | ) | |
| CAPITOL EUROPE, S.A. | ) | |
| | ) | |
|     Plaintiff, | ) | Case No. 3:06-cv-00587-MEF-VPM |
| | ) | |
|     v. | ) | |
| | ) | |
| SÜD-CHEMIE AG; | ) | **JURY TRIAL DEMANDED** |
| SÜD-CHEMIE, INC.; and | ) | |
| AIRSEC S.A. | ) | |
| | ) | |
|     Defendants. | ) | |

**FIRST AMENDED COMPLAINT AND JURY DEMAND**

1.      Plaintiff CSP Technologies, Inc. ("CSP") has been and is the victim of a worldwide scheme intended to drive CSP out of business.  Prior to 2002, Defendant Süd-Chemie, Inc. ("SCI") held a monopoly on the diagnostic test strip packaging market and the glucose test strip packaging sub-market.  CSP invented a groundbreaking packaging technology in 1995 and began to threaten SCI's market share in 2002.  Since 2002, CSP has continued to acquire additional market share in the diagnostic test strip packaging market and the glucose test strip packaging sub-market based upon CSP's superior packaging technology, removing SCI's monopoly over that market.  In response, SCI has formulated a deliberate and illegal scheme intended to destroy CSP and to regain its monopoly.

2.      In furtherance of its scheme, SCI has instituted nuisance sham litigation against CSP, used interstate communications to undermine CSP as a competitor, and engaged in other predatory activities to eliminate CSP as a viable competitor and attempted to monopolize the diagnostic test strip packaging market and the glucose test strip packaging sub-market.  In doing so, SCI has violated the antitrust laws and competition laws of the United States.  CSP brings

this action for injunctive relief against SCI's illegal scheme and for monetary relief for the harm that SCI's illegal scheme has caused.

## PARTIES

3.    Plaintiff CSP is an Alabama corporation having its principal place of business at 960 West Veterans, Auburn, AL 36832.

4.    Plaintiff Capitol Europe S.A. ("Capitol Europe") is a French corporation having its principal place of business at Z.I. du Sandholz 67110 Niederbronn-les-Bains, France.

5.    On information and belief, Defendant Süd-Chemie AG ("SCAG") is a German corporation having its principal place of business at Lenbachplatz 6, 80333 Munich, Germany.  It conducts business and is found in this district.  The extent of Defendant Süd-Chemie AG's business in this district will be established after a reasonable opportunity for discovery.

6.    On information and belief, Defendant Süd-Chemie, Inc. ("SCI") is a Delaware corporation having its principal place of business at 1600 West Hill Street, Louisville, Kentucky 40210.  It conducts business and is found in this district.  The extent of Defendant Süd-Chemie Inc.'s business in this district will be established after a reasonable opportunity for discovery.

7.    On information and belief, Defendant Airsec S.A. ("Airsec") is a French corporation having its principal place of business at 17 rue G. Clemenceau, Botie Postale 207, 94603 Choisy le Roi, France.  It conducts business and is found in this district.  The extent of Defendant Airsec S.A.'s business in this district will be established after a reasonable opportunity for discovery.

## JURISDICTION AND VENUE

8.    This action arises under the antitrust laws of the United States, Title 15 of the United States Code §§ 1 et. seq., and the civil racketeering laws of the United States, Title 18 of the United States Code §§ 1961 et. seq.

9.      Jurisdiction is conferred on this Court by 15 U.S.C. §§ 4, 15, and 26; 18 U.S.C. § 1964; and 28 U.S.C. §§ 1331 and 1337.

10.     On information and belief, this Court has personal jurisdiction over Defendant Süd-Chemie AG because it has sufficient minimum contacts to establish personal jurisdiction in this district.  The extent of Defendant Süd-Chemie AG's contacts in this district will be established after a reasonable opportunity for discovery.

11.     On information and belief, this Court has personal jurisdiction over Defendant Süd-Chemie, Inc. because it has sufficient minimum contacts to establish personal jurisdiction in this district.  The extent of Defendant Süd-Chemie Inc.'s contacts in this district will be established after a reasonable opportunity for discovery.

12.     On information and belief, this Court has personal jurisdiction over Defendant Airsec S.A. because it has sufficient minimum contacts to establish personal jurisdiction in this district. The extent of Defendant Airsec S.A.'s contacts in this district will be established after a reasonable opportunity for discovery.

13.     Venue is proper in this district under 15 U.S.C. §§ 15(a), 22 and 26; 18 U.S.C. § 1965; and 28 U.S.C. §§ 1391 (b), (c) and (d).

## **TRADE AND COMMERCE**

14.     CSP and Capitol Europe are engaged in interstate and foreign commerce, including substantial sales of specialty plastic products in the United States and Europe.  CSP operates production facilities in Auburn, Alabama and Capitol Europe operates production facilities in Niederbronn-les-Bains, France.

15.     On information and belief, the Defendants are all separately engaged in commerce or activity affecting commerce, including substantial sales of specialty plastic products in the United States and Europe.

16.     The Defendants' actions that give rise to the antitrust claims asserted herein have had an intended and substantial effect within the United States, including draining millions of dollars worth of CSP's competitive resources and harming CSP's ability to compete in interstate and foreign commerce.

17.     The Defendants' actions that give rise to the antitrust claims and the civil racketeering claims asserted herein have had an intended, direct, substantial and reasonably foreseeable effect on interstate commerce, import commerce and export commerce within the meaning of 15 U.S.C. § 6a, and have been an effort to extort CSP into compliance with the Defendants' predatory goals of destroying or crippling CSP as a viable competitor under interstate and foreign commerce under 18 U.S.C. § 1962.

## FACTUAL BACKGROUND

18.     CSP is a small, privately held design and engineering company specializing in desiccant-entrained delivery systems, airtight, leak-proof containers, and custom development of plastic products and systems.  CSP has developed innovative products in cooperation with researchers at universities throughout the United States.  CSP holds patents on a plastic vial with an attached lid that incorporates a moisture tight seal, and on desiccant-entrained polymers that, among other things, absorb moisture.

19.     CSP manufactures its products at its plant in Auburn, Alabama.

20.     Capitol Europe is CSP's European affiliate.   Capitol Europe is engaged in the manufacture and sale of CSP's plastic products in Europe.

21.     Capitol Europe manufactures CSP's patented products at its plant in Niederbronn-les-Bains, France.

22.     Defendant Süd-Chemie AG is a large German company located in Munich with offices throughout the world.

23.    Defendant Süd-Chemie, Inc. is a subsidiary of Süd-Chemie AG, located in Louisville, Kentucky.   Süd-Chemie, Inc. includes a business division known as Süd-Chemie Performance Packaging ("SCPP"), which is located in Belen, New Mexico and has sales offices throughout the world.

24.    Defendant Airsec S.A. is a subsidiary of Süd-Chemie AG, located in France.

25.    Defendant Süd-Chemie AG; Defendant Süd-Chemie, Inc.; and Defendant Airsec S.A. are all independent corporate entities.   Defendant Süd-Chemie, Inc. maintains its own Board of Directors, which is separate and apart from the Board of Directors for Defendant Süd-Chemie AG, and which is separate and apart from the Board of Directors for Defendant Airsec S.A. Likewise, Defendant Airsec S.A. maintains its own Board of Directors, which is separate and apart from the Board of Directors for Defendant Süd-Chemie AG, and which is separate and apart from the Board of Directors for Defendant Süd-Chemie, Inc.

26.    Neither SCAG, SCI, nor Airsec is the mere instrumentality of the other.

27.    SCI and Airsec have no direct corporate relationship; they are distinct corporations.

28.    CSP and SCI compete for sales of diagnostic test strip packaging products.  Diagnostic strips are used in a wide variety of testing applications, including urinalysis tests, tests that monitor cholesterol and glucose levels.  Diagnostic test strips often require packaging that can provide a moisture-free environment.   In particular, glucose test strips require moisture-free packaging.

29.    On information and belief, prior to 2002 SCI held monopolies in the diagnostic test strip packaging market and the glucose test strip packaging sub-market.  More specifically, SCI held at least a 70% share of the glucose test strip packaging sub-market in the United States and

Europe.  SCI dominated those markets with its tube-and-stopper products.  The full extent of SCI's market power will be established after a reasonable opportunity for discovery.

30.     In or around 2001, CSP began selling a revolutionary diagnostic test strip packaging product.  CSP's innovative product featured a desiccant-entrained polymer for absorption of moisture.

31.     CSP has spent millions of dollars in developing, commercializing, and patenting its groundbreaking technology.

32.     With the introduction of its new products featuring the innovative desiccant-entrained polymer, CSP revolutionized the diagnostic test strip packaging market.

> When [CSP] entered the market with a tube that contains injection molded desiccant with an easy-to-open flip top cap, they were received by the market with open arms.

(Exhibit A at SCI 011986.)[1]

33.     On information and belief, Defendants began losing substantial market share to CSP's new product in approximately 2002.  On information and belief, in late 2002 and early 2003, SCI began losing substantial market share to CSP's new product.

> We will continue to fight, but I think the reality is, the [CSP] type tube with 2AP type material inside with a hinge cap will take over as the primary packaging for glucose strips, and all other test strips.  At least in the U.S. and possibly the world until a better packaging is introduced like a dispensing unit.

(Exhibit B at SCI 012365.)

> To date, we are not able to push our 2AP technology until patent issues are resolved.  With the market going to the new tube with injection molded desiccant and hinge cap our sales growth will continue to decline.

---

[1] Certain exhibits attached hereto have been marked "Confidential" by SCI during the course of the Indiana litigation.  However, all such documents were admitted into evidence at trial in the Indiana litigation.  Therefore, all the exhibits attached hereto constitute public information.  See Stipulated Protective Order Pursuant to Rule 26(c), ¶¶9, 21, entered October 28, 2003, Civil Action No. 4:03-CV-003-SEB-WGH (S.D. Ind.).

(Exhibit A at SCI 011986.)

34.    On information and belief, SCI identified CSP as a significant threat to SCI's business in

the diagnostic test strip packaging market.

> [CSP] are our primary competitor in the North American market.  Unless we are
> able to come up with our version of a tube with hinge cap with desiccant polymer
> we will continue to lose sales.

(Exhibit A at SCI 011991.)

> [CSP's] biggest threat are the tubes and stoppers, and injection molded products.
> They are our primary competitor in the North American market.  Unless we are
> able to come up with our version of a tube with hinge cap with desiccant polymer,
> or a new strip-dispensing device, we will continue to lose market share.

(Exhibit A at SCI 011991.)

35.    On information and belief, SCI developed an illegal shark-like scheme to destroy or

cripple CSP in order for SCI to regain its monopoly power in the markets in which SCI and CSP

compete.  (*See* Exhibit C at SCI 005780.)  The full extent of SCI's scheme and its illegal

activities in furtherance thereof will be established after a reasonable opportunity for discovery.

36.    On August 30, 2002, SCI set forth its illegal scheme to destroy or cripple CSP in order

for SCI to regain its monopoly power.

> BPE Strategy and next steps
>
> -    Filing for a Süd-Chemie patent in the USA for our new "distinct phase
>      separation technology" based on a two-component system
>
> -    Acquisition of Gaplast patent for Europe
>
> -    Threatening CSP with patent infringement in Europe
>
> -    Filing for a declaratory judgment in the USA prior to entering the USA
>      market
>
> -    Informing CSP accordingly and offering to negotiate a business solution for
>      Europe and the USA

(*See* Exhibit D at SCI 005704.)

37.    On information and belief, the Defendants committed at least the following overt acts in furtherance of SCI's scheme:

a.    Süd-Chemie A.G. and Airsec acquired a patent in France (the Gaplast patent) for the sole purpose of threatening CSP, Capitol Europe, and their customers;

b.    SCI made baseless threats against CSP, Capitol Europe, and their customers regarding infringement of the Gaplast patent;

c.    Airsec brought a sham litigation against Capitol Europe in France alleging infringement of the Gaplast patent;

d.    SCI threatened CSP with, among other things, expensive and meritless litigation in the United States and Europe;

e.    SCI filed frivolous oppositions to CSP's published patent applications in Europe;

f.    SCI brought a sham litigation against CSP in the United States;

g.    SCI repeatedly lied to CSP's customers regarding CSP's economic and competitive positions; and

h.    SCI copied CSP's patented technology and willfully infringed CSP's patents.

The full extent of SCI's scheme and its illegal activities in furtherance thereof will be established after a reasonable opportunity for discovery.

## SCAG AND AIRSEC ACQUIRED THE GAPLAST PATENT

38.    SCAG acquired an asset for furthering its scheme of destroying CSP as a viable competitor of SCI.  The asset was European Patent No. EP 454967 ("the Gaplast patent"), which

SCAG acquired from Gaplast GmbH. The European application for the Gaplast patent included designations in Belgium, Switzerland, Germany, Denmark, Spain, France, Great Britain, Italy, the Netherlands, and Sweden.

39.    SCAG recorded in the French patent office an assignment of the Gaplast patent's French national stage application from Gaplast GmbH to SCAG. The assignment was executed by Gaplast GmbH on or around September 18, 2002 and by SCAG on or around October 2, 2002. That assignment indicated that the consideration for assigning the rights to the Gaplast patent in France was 20,000 Euros. (Exhibit E.)

40.    Airsec recorded in the French patent office an assignment of the Gaplast patent's French national stage application from SCAG to Airsec. The assignment was executed by SCAG on or around October 15, 2002 and by Airsec on or around October 17, 2002. That assignment indicated that the consideration for assigning the rights to the Gaplast patent in France was 20,000 Euros. (Exhibit F.)

41.    The Gaplast patent is asserted by SCAG and Airsec to relate to a desiccant polymer composition made by an injection-molding process. The disclosure of the Gaplast patent provides little technical detail about the compositions or the processes by which they are made. Testing has revealed that the compositions disclosed by the Gaplast patent are impossible to produce effectively.

42.    On information and belief, SCAG and Airsec acquired the Gaplast patent knowing that it had little or no commercial value. The lack of commercial value for the Gaplast patent is reflected by the relatively small sums of money given as consideration for the various assignments of the Gaplast patent. On information and belief, SCAG, SCI, and Airsec knew that practicing the Gaplast patent was not technically feasible.

43.     On information and belief, SCAG and Airsec acquired the Gaplast patent for the sole purpose of threatening CSP and its customers and draining CSP's economic viability and, inter alia, attempting to weaken or destroy CSP as a competitor. The full extent of Süd-Chemie's bad faith in acquiring the Gaplast patent will be established after a reasonable opportunity for discovery.

### SÜD-CHEMIE THREATENED CSP AND ITS CUSTOMERS

44.     Before Süd-Chemie A.G. and Airsec had even acquired the Gaplast patent, SCI began informing CSP's and Capitol Europe's customers in Europe that CSP's products infringed the Gaplast patent. SCI threatened CSP's and Capitol Europe's customers that CSP would no longer be able to supply its products because CSP was infringing the Gaplast patent.

45.     On or around October 1, 2002, Klaus Langer (Süd-Chemie's Global Business Unit Manager for Performance Packaging) proposed a meeting with CSP President Robert S. Abrams to discuss a "business agreement." This was shortly after the acquisition of the aforesaid Gaplast patent and was part and parcel of Süd-Chemie's intent to weaken or destroy CSP as a competitor.

46.     On or around October 25, 2002, Mr. Langer, Mr. Abrams and others attended a meeting in Zurich, Switzerland ("the Zurich meeting").

47.     At the Zurich meeting, Mr. Langer informed Mr. Abrams that Süd-Chemie wanted to reach an agreement covering both the United States and Europe.

48.     At the Zurich meeting, Mr. Langer proposed to Mr. Abrams a cross-licensing arrangement under which Süd-Chemie would grant a license to CSP under the worthless European Gaplast patent in exchange for CSP granting a license to Süd-Chemie under CSP's patents in the United States and Europe. Mr. Langer proposed that Süd-Chemie and CSP stand side-by-side in asserting the patents against any possible competitor in order to divide world markets. Mr. Abrams explained to Mr. Langer that his proposal was illegal.

49.    At the Zurich meeting, Mr. Langer offered Mr. Abrams an "even swap" of a license under the Gaplast patent for a license under CSP's patents.  When he made that offer, Mr. Langer knew that CSP had spent over $20 million developing its patented technology, and that Süd-Chemie had recently paid only 20,000 Euros for the rights to the Gaplast patent in France.

50.    At the Zurich meeting, Mr. Abrams requested a chance to evaluate the value of the Gaplast patent.  Mr. Langer replied that no such evaluation would be necessary because the agreement that Mr. Langer envisioned was not based on an economic comparison, but rather was a "global settlement."

51.    At the Zurich meeting, Mr. Langer threatened Mr. Abrams that if CSP did not meet Süd-Chemie's demands, Süd-Chemie would use its size, resources and financial strength to destroy CSP by filing patent lawsuits worldwide, which Süd-Chemie would make protracted and expensive without regard to the merits of the litigation.

52.    At the Zurich meeting, Mr. Langer threatened Mr. Abrams that Süd-Chemie would protest the validity of CSP's patents in United States courts; that Süd-Chemie would oppose CSP's patents in Europe; that Süd-Chemie would notify all of CSP's European customers that CSP was infringing the Gaplast patent; and that Süd-Chemie would tie up CSP in litigation that would take years and cost CSP millions of dollars.

53.    At the Zurich meeting, Mr. Langer threatened Mr. Abrams that European companies would not do business with an American company that was tied up in patent litigation.

54.    At the Zurich meeting, Mr. Langer threatened Mr. Abrams that European companies particularly would not do business with a Jewish American company that was tied up in patent litigation.

55.    After the Zurich meeting, Mr. Langer proposed another meeting with Mr. Abrams.

56.      After the Zurich meeting, several of CSP's and Capitol Europe's customers reported to CSP that SCI's threats relating to the Gaplast patent had become a problem.

57.      On or around January 16, 2003, Mr. Langer, Mr. Abrams and others attended a meeting in London, England ("the London meeting").

58.      At the London meeting, Süd-Chemie agreed to provide samples of products described by the Gaplast patent. Süd-Chemie never provided any such samples.

59.      On or about August 19, 2003, Süd-Chemie A.G. and SCI contacted Bayer A.G. and suggested that the use of CSP's containers in the sale of the Ascensia Microfill product constitutes an infringement of Airsec's Gaplast patent.

60.      Bayer A.G. is a global supplier of diagnostic test kits and test strips. Süd-Chemie A.G. and SCI's threats to Bayer that they were infringing the Gaplast patent if they used CSP's container caused great concern to Bayer. Use of an infringing container would affect Bayer's products worldwide, including in the U.S. Bayer took this threat so seriously that they conducted their own analysis regarding whether CSP's containers infringed the Gaplast patent.

61.      On October 16, 2003 Bayer A.G. informed SCI that Bayer A.G. had concluded that CSP's containers do not infringe the Gaplast patent.

62.      SCI's unsupported patent infringement threat was an attempt by SCI to interfere directly with CSP's business relationship with Bayer, globally and in the U.S. SCI's unsupported patent infringement threats to Bayer A.G. threatened the use of CSP's container by Bayer throughout the world, including in the U.S. SCI's unsupported patent infringement threats are a part and parcel of SCI's deliberate scheme to destroy or competitively cripple CSP.

63.      Süd-Chemie A.G. and SCI made similar threats against other global customers of CSP and Capitol Europe. These unsupported threats of patent infringement litigation threatened the

-12-

use of CSP's container throughout the world, including in the U.S. SCI's unsupported patent infringement threats are a part and parcel of SCI's deliberate scheme to destroy or competitively cripple CSP.

64.    CSP and Capitol Europe have incurred substantial costs in responding to the Defendants' unsupported threats. These costs include, for example, fees for the retention of expert consultants and attorneys, as well as the costs of worldwide travel for meetings with threatened customers and costs for financing all of CSP's defensive activities in response to the Defendants' threats.

65.    Süd-Chemie A.G. and SCI's contacts with CSP's customers caused CSP's customers to fear involvement in patent infringement and litigation.

66.    Süd-Chemie A.G. and SCI's contacts with CSP's customers caused CSP's customers to fear economic harm if they could no longer obtain CSP's product.

67.    Süd-Chemie A.G. and SCI's contacts with CSP's customers were and are an attempt by SCI to obtain CSP's customers and CSP's sales through a threat of patent infringement and litigation.

68.    Süd-Chemie A.G. and SCI's contacts with CSP's customers were and are an attempt for SCI to obtain CSP's customers and CSP's sales through the inducement of fear in CSP's customers that CSP would no longer be able to supply its products.

69.    CSP has been deprived of property and economically injured by Süd-Chemie A.G. and by SCI's false representations to and coercion of CSP's customers.

70.    Süd-Chemie A.G. and SCI have made false representations to CSP's customers in documents deposited for delivery by the United States Postal Service and in documents transmitted by wire in interstate commerce. Because these documents were transmitted by

Defendants to third parties, CSP is not in possession of many such documents. CSP is advised by its customers, however, that such documents, containing false representations regarding CSP, have been transmitted by mail and wire. CSP will establish the full extent of Defendants' mail and wire fraud after a reasonable opportunity for discovery.

71.     Süd-Chemie A.G. and SCI have made false representations to CSP's customers in statements transmitted by wire in interstate commerce. CSP will establish the full extent of Defendants' mail and wire fraud after a reasonable opportunity for discovery.

72.     Süd-Chemie A.G. and SCI intended that their false representations be relied on by persons who purchase or intend to purchase CSP's product. CSP will establish the full extent of Defendants' mail and wire fraud after a reasonable opportunity for discovery.

## AIRSEC BROUGHT A SHAM LITIGATION AGAINST CSP IN EUROPE

73.     On or around April 16, 2003, Defendant Airsec S.A. filed a lawsuit against CSP's European business unit, Capitol Europe, in the District Court in Strasbourg, France, alleging infringement of the Gaplast patent ("the French litigation").

74.     On or around November 20, 2003, the French Court dismissed the French litigation, awarding to CSP 5,000 Euros in damages plus its attorneys fees.

75.     In dismissing the French litigation, the French Court stated:

> The behavior of the plaintiff [Airsec S.A.] and its refusal … to supply technical details on how [CSP's products] infringe the specifications of its patent's claims, constitutes a serious breach of its obligations under Article 56 … with the obvious aim of frustrating the defendant's rights constitutes misconduct, causing injury to the defendant [CSP], for which it should be awarded relief against the plaintiff [Airsec S.A.] of 5000 [Euros] in damages.

(Exhibit G, Order, Doc. No. 03/02721 at 3 (Strasbourg Dist. Ct., Nov. 20, 2003).)

76.     The French litigation was objectively baseless in that no reasonable litigant could realistically expect success on the merits.

77.     The French litigation was a sham attempt by Süd-Chemie to interfere directly with the business relationships of CSP.  The French litigation drained CSP's competitive resources.  Süd-Chemie continually made threats to CSP's customers regarding the French litigation.  The French litigation was brought in bad faith as a part of Süd-Chemie's deliberate scheme to destroy or competitively cripple CSP.

78.     Because the French litigation was objectively baseless and was an attempt by Süd-Chemie to interfere directly with the business relationships of CSP, the French litigation was a sham.  Accordingly, Süd-Chemie cannot be afforded immunity under the Noerr-Pennington doctrine for bringing the French litigation.

79.     CSP and Capitol Europe have incurred substantial costs in connection with the French litigation including, for example, attorney's fees, expert witness expenses and worldwide travel costs, as well as costs for financing all of CSP's defensive activities in response to the sham French litigation.

## SCI CONTINUES TO CARRY OUT ITS SCHEME IN THE INDIANA LITIGATION

80.     As it threatened it would do, SCI filed a declaratory judgment action against CSP, Civil Action No. 4:03-CV-003-SEB-WGH, currently pending in the United States District Court for the Southern District of Indiana ("the Indiana litigation").  SCI brought the Indiana litigation in bad faith and has made the Indiana litigation unnecessarily protracted and expensive for CSP.

81.     SCI implemented its scheme through harassing and vexatious litigation techniques in the Indiana action.

82.     SCI has contested the validity of CSP's patent portfolio (as promised), despite the fact that there is no case or controversy regarding infringement of many of those patents.

83.     SCI's assertion of those patents was calculated to complicate and delay the trial, and increase the cost of litigation.

84.    Despite the fact that there is no case or controversy regarding these patents, SCI continues to press its claims in furtherance of its tactic to "bury" CSP with patent litigation expenses.

85.    SCI has also manipulated the discovery process in the Indiana action to increase the expense and burden of this litigation on CSP.

86.    SCI placed over 1000 documents on its privilege log, many of which it later admitted were not privileged.  The Magistrate Judge in the Indiana action characterized SCI's privilege claims as "significantly overbroad."

87.    During discovery, SCI fought to keep from having its witnesses deposed in the United States, despite the fact that SCI chose the forum for this suit, and SCI listed some of these witnesses as the most knowledgeable individuals regarding some of SCI's claims.

88.    CSP informed SCI that it wanted to take the Dick deposition prior to the depositions of other SCI witnesses.

89.    SCI then grossly misled the Court and CSP regarding the ability of their witness, Stefan Dick, to travel to the United States.

90.    SCI told the Court and CSP that Stefan Dick was under a doctor's order, and could not travel for his scheduled deposition on October 14, 2005 because of complications from surgery.

91.    Dr. Dick was in his office the week of his scheduled deposition.

92.    Dr. Dick traveled from Germany to California on October 15, 2005.

93.    The ruse concerning Dr. Dick's availability was calculated to disrupt CSP's trial preparation, and to increase the costs of discovery.

94.    During the *Markman* Hearing, counsel for SCI represented to the Court that SCI had been selling the accused product (or something nearly identical to it) for many years.

95.    Discovery shows that SCI never sold the accused product prior to the offer for sale that gave rise to the Indiana action.

96.    During the *Markman* Hearing, counsel for SCI represented that SCI's accused product contained "layers," which was a critical issue in the Indiana litigation.

97.    An Airsec scientist informed SCAG personnel long before the *Markman* hearing that SCI's accused product was not layered.

98.    At the trial in the Indiana action, SCI's expert admitted that SCI's product did not contain layers.

99.    During the *Markman* Hearing, counsel for SCI represented that EVA, a component of the accused product, was hydrophobic, which related to a critical issue in the case.  At the time, SCI was aware that EVA is hydrophilic (the opposite of hydrophobic).

100.    CSP has incurred millions of dollars of costs in connection with the Indiana litigation, including, for example attorneys fees, expert witness expenses and worldwide travel costs, as well as costs for financing all of CSP's defensive activities in response to the sham Indiana litigation.

101.    SCI's positions in the Indiana litigation are objectively baseless in that no reasonable litigant could realistically expect success on the merits.

102.    The Indiana litigation is a sham attempt by SCI to interfere directly with the business relationships of CSP.  The Indiana litigation has drained CSP's competitive resources.  The Indiana litigation was brought in bad faith as a part of Defendant's deliberate scheme to destroy or competitively cripple CSP.

103.    Because the Indiana litigation is objectively baseless and an attempt by Defendants to interfere directly with the business relationships of CSP, the Indiana litigation was a sham.

Accordingly, Defendants cannot be afforded immunity under the *Noerr-Pennington* doctrine for bringing the Indiana litigation.

104.    In May of 2006, a trial in the Indiana litigation was held in Indianapolis on the issues of validity and infringement.

105.    After the trial, the Court found that CSP's asserted patents, U.S. Patent Nos. 5,911,937 and 6,214,255 were valid and infringed by SCI. *See Sud-Chemie Inc. v. CSP Technologies, Inc.*, 2006 U.S. Dist. LEXIS 54873, at *157 (S.D. Ind. Aug. 4, 2006).

106.    In connection with its litigation tactics and positions, SCI presented "misleading", "unreasonable", "improper", "unconnected", "contradictory", "implausible" and "strained" positions, offered theories "without evidentiary or legal merit", made "frequent obfuscations", attempted "trial by ambush" tactics, "refused to honor" concessions made to the Court, and "disregard[ed] …its duty of candor to the Court [and] to opposing counsel as well". *See Sud-Chemie Inc. v. CSP Technologies, Inc.*, 2006 U.S. Dist. LEXIS 54873, at *86, 89-91, 98-99, 102, 109-112, 115, 136 (S.D. Ind. Aug. 4, 2006).

107.    The Court also found that prior to initiating the Indiana litigation, SCI believed that it was infringing CSP's patents. *See Sud-Chemie Inc. v. CSP Technologies, Inc.*, 2006 U.S. Dist. LEXIS 54873, at *23-26 (S.D. Ind. Aug. 4, 2006).

108.    SCI, therefore, initiated the Indiana litigation seeking a declaratory judgment that it did not infringe CSP's patents, despite its knowledge that it was infringing CSP's patents.

### AIRSEC CONTINUES TO CARRY OUT ITS SCHEME IN EUROPE

109.    Airsec continues to prosecute the sham French litigation, including the filing of a frivolous appeal.

110.    As it threatened it would do, Airsec has filed frivolous oppositions to CSP's published patent applications in Europe.

## RELEVANT MARKETS

111.    A relevant product market is the diagnostic test strip packaging market.

112.    Prior to 2002, the diagnostic test strip packaging market was dominated by two suppliers, SCI and Friedrich Sanner GmbH & Co. KG ("Sanner").

113.    On information and belief, there are only three suppliers in the diagnostic test strip packaging market today: CSP, SCI, and Sanner.

114.    Entry into the U.S. diagnostic test strip packaging market is extremely difficult, expensive, and time-consuming, as test strip packaging must undergo extensive regulatory review and be approved by the FDA for each product with which it is used.

115.    Entry into the European diagnostic test strip packaging market is extremely difficult, expensive, and time-consuming, as test strip packaging must undergo extensive regulatory review and be approved by the European Commission for each product with which it is used.

116.    Entry into the U.S. and European diagnostic test strip packaging market is extremely difficult, expensive, and time-consuming, as diagnostic test strip suppliers are not willing to commit the time, money, and resources and re-enter regulatory review on an existing product simply to change packaging.  Therefore, diagnostic test strip packaging suppliers must wait for new test strip products to be developed and submitted for regulatory review to enter into the market.

117.    A relevant product sub-market is the glucose test strip packaging sub-market.

118.    Prior to 2002, the glucose test strip packaging market was dominated by two suppliers, SCI and Friedrich Sanner GmbH & Co. KG ("Sanner").

119.    On information and belief, there are only three suppliers in the glucose test strip packaging market today: CSP, SCI, and Sanner.

120.    Entry into the U.S. glucose test strip packaging market is extremely difficult, expensive, and time-consuming, as test strip packaging must undergo extensive regulatory review and be approved by the FDA for each product with which it is used.

121.    Entry into the European glucose test strip packaging market is extremely difficult, expensive, and time-consuming, as test strip packaging must undergo extensive regulatory review and be approved by the European Commission for each product with which it is used.

122.    Entry into the U.S. and European glucose test strip packaging market is extremely difficult, expensive, and time-consuming, as diagnostic test strip suppliers are not willing to commit the time, money, and resources and reenter regulatory review on an existing product simply to change packaging.  Glucose test strip packaging suppliers therefore must wait for new test strip products to be developed and submitted for regulatory review to enter into the market.

123.    The relevant geographic market is the United States.

124.    The second relevant geographic market is Europe.

125.    The relevant time period is 1998 to the present.

## COUNT I
### (Attempted Monopolization)

126.    CSP incorporates by reference the allegations in paragraphs 1-125 above, as if fully alleged herein.

127.    SCI, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, has and is attempting to acquire a monopoly in the diagnostic test strip packaging market and the glucose test strip packaging sub-market.

128.    Prior to 2002 SCI had over 70% of the diagnostic test strip packaging market and the glucose test strip packaging sub-market.

129.    In 2002, CSP began to threaten SCI's market share with its new packaging technology.

130.    Since 2002, CSP has continued to acquire additional market share in the diagnostic test strip packaging market and the glucose test strip packaging sub-market based upon CSP's superior packaging technology thereby removing SCI's monopoly over that market.

131.    In response, SCI, Süd-Chemie A.G., and Airsec are attempting to re-acquire a monopoly in the diagnostic test strip packaging market and the glucose test strip packaging sub-market by engaging in anticompetitive conduct including leveraging and sham litigation.

132.    SCI, Süd-Chemie A.G., and Airsec have acted with specific intent to acquire a monopoly in the diagnostic test strip packaging market and the glucose test strip packaging sub-market by acquiring a worthless patent in France (the Gaplast patent) for the sole purpose of threatening CSP and its customers.

133.    SCI and the Defendants have acted with specific intent to acquire a monopoly in the diagnostic test strip packaging market and the glucose test strip packaging sub-market by making baseless threats against CSP and its customers regarding infringement of the Gaplast patent.

134.    Airsec has acted with specific intent of assisting SCI to acquire a monopoly in the diagnostic test strip packaging market and the glucose test strip packaging sub-market by bringing a sham litigation against Capitol Europe in France alleging infringement of the Gaplast patent.

135.    SCI and the Defendants have acted with specific intent to acquire a monopoly in the diagnostic test strip packaging market and the glucose test strip packaging sub-market by threatening CSP with, among other things, expensive and meritless litigation in the United States and Europe.

136.    SCI, Süd-Chemie A.G., and Airsec have acted with specific intent to acquire a monopoly in the diagnostic test strip packaging market and the glucose test strip packaging sub-market by filing frivolous oppositions to CSP's published patent applications in Europe.

137.    SCI has acted with specific intent to acquire a monopoly in the diagnostic test strip packaging market and the glucose test strip packaging sub-market by repeatedly lying to CSP's customers regarding CSP's economic and competitive positions.

138.    SCI, Süd-Chemie A.G., and Airsec acted with the specific intent to force CSP and Capitol Europe to enter into an illegal market division agreement.

139.    The Defendants' various predatory and exclusionary conduct set forth in paragraphs 35-106 give rise to the dangerous probability that SCI will succeed in its attempt to acquire a monopoly in the diagnostic test strip packaging market and the glucose test strip packaging sub-market.

140.    SCI, Süd-Chemie A.G., and Airsec's violation of the Sherman and Clayton Acts has harmed CSP's ability to compete in the diagnostic test strip packaging market and the glucose test strip packaging sub-market by draining CSP's competitive resources.

141.     SCI, Süd-Chemie A.G., and Airsec's violation of the Sherman and Clayton Acts has harmed CSP's ability to compete in the diagnostic test strip packaging market and the glucose test strip packaging sub-market by forcing CSP to undertake unnecessary efforts and expenses to protect CSP's reputation and good will and to secure new business opportunities.

142.    SCI, Süd-Chemie A.G., and Airsec's violation of the Sherman and Clayton Acts has harmed CSP's ability to compete in the diagnostic test strip packaging market and the glucose test strip packaging sub-market by preventing CSP from acquiring a larger share of the

diagnostic test strip packaging market and the glucose test strip packaging sub-market more quickly.

143.    SCI, Süd-Chemie A.G., and Airsec's anticompetitive conduct is part of SCI, Süd-Chemie A.G., and Airsec's deliberate scheme to destroy CSP and for SCI to acquire monopoly power in the U.S. diagnostic test strip packaging market and glucose test strip packaging sub-market. Thus, there is a direct and intended causal connection between SCI, Süd-Chemie A.G., and Airsec's illegal activities and the harm suffered by CSP.

144.    If SCI, Süd-Chemie A.G., and Airsec's efforts to destroy CSP are successful, SCI will acquire at least 90% monopoly power in the diagnostic test strip packaging market and the glucose test strip packaging sub-market.

145.    If SCI's efforts to maintain its monopoly power over the U.S. diagnostic test strip packaging market and the U.S. glucose test strip packaging sub-market are successful and CSP is removed from the marketplace, consumers in the United States will be harmed, including by having to pay higher prices and having fewer choices of products.

146.    CSP has suffered antitrust injury.

147.    CSP has standing to bring this claim for damages against SCI, Süd-Chemie A.G., and Airsec pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15(a).

148.    If not enjoined, SCI, Süd-Chemie A.G., and Airsec's conduct is likely to continue until CSP is destroyed, until competition in the U.S. diagnostic test strip packaging market and the glucose test strip packaging sub-market is destroyed, and until SCI has acquired a monopoly. Thus, CSP has standing to bring this claim for an injunction against SCI, Süd-Chemie A.G., and Airsec pursuant to 15 U.S.C. § 26.

## COUNT II
### (Pattern of Unlawful Activity under 18 USC §1961, *et. seq.*)

149.    CSP incorporates by reference the allegations in paragraphs 1-148 above, as if fully alleged herein.

150.    Plaintiffs are "persons" within the meaning of 18 U.S.C. §§1961(3) and 1964(c).

151.    Süd-Chemie A.G. and its subsidiaries including SCI and Airsec are each and have been collectively a "person" within the meaning of 18 U.S.C. §§1961(3) and 1962(a).

152.    Süd-Chemie A.G. and its subsidiaries including SCI and Airsec are each and have been collectively an "enterprise" within the meaning of 18 U.S.C. §§1961(4) and 1962(a) that are and have been engaged in, or the activities of which affect and have affected, interstate commerce within the meaning of 18 U.S.C. §1962(a).

153.    Süd-Chemie A.G. and its subsidiaries including SCI and Airsec have engaged in a pattern of unlawful activity to destroy CSP, eliminate competition for SCI in the U.S. diagnostic test strip packaging market and glucose test strip packaging sub-market, and to acquire a monopoly for SCI in the U.S. diagnostic test strip packaging market and glucose test strip packaging sub-market within the meaning of 18 U.S.C. §§ 1961(1), 1961(5), and 1962(a).

154.    Süd-Chemie A.G. and its subsidiaries including SCI and Airsec have engaged in repeated and numerous acts constituting mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343. CSP will establish the full extent of Defendants' mail and wire fraud after a reasonable opportunity for discovery.

155.    Süd-Chemie A.G., SCI, and Airsec's pattern of unlawful activity and corresponding violations of 18 USC § 1962 proximately and/or directly caused CSP to suffer injury to its business or property within the meaning of 18 USC § 1964(c).  The damages suffered by CSP

were reasonably foreseeable by the Defendants and/or anticipated as a substantial factor and a natural consequence of their pattern of unlawful activity.

## **PRAYER FOR RELIEF**

WHEREFORE, CSP and Capitol Europe pray that this Court grant the following relief:

A.     Order Defendants to account for damages sustained by CSP and Capitol Europe as a result of Defendants' violations of the antitrust laws and Defendants' pattern of unlawful activity under 18 USC § 1961, *et. seq.*

B.     Treble the damages resulting from Defendants' violations, including, *inter alia*, the expenses of resisting Defendants' baseless lawsuits, as required by 15 U.S.C. § 15(a) and 18 U.S.C. § 1964(c).

C.     Award to CSP and Capitol Europe the costs and reasonable attorney fees in prosecuting this action, as required by 15 U.S.C. § 15(a) and 18 U.S.C. § 1964(c).

D.     Order Defendants to pay prejudgment interest on any award made.

E.     Permanently enjoin Defendants from engaging in the unfair and unlawful acts and practices alleged in this complaint pursuant to 15 U.S.C. § 26 and 18 U.S.C. § 1964(a).

F.     Such further relief as this Court deems just.

## JURY DEMAND

CSP and Capitol Europe demand a trial by jury on all issues so triable.

Dated this 25th day of September, 2006.

s/ Charles A. Stewart III
Charles A. Stewart III (STE067)
BRADLEY ARANT ROSE & WHITE LLP
401 Adams Avenue, Suite 780
Montgomery, Alabama 36104
Telephone: (334) 956-7608
Facsimile: (334) 956-7808

George P. McAndrews
Richard T. McCaulley, Jr.
James R. Nuttall
Ronald A. DiCerbo
John L. Abramic
Matthew A. Anderson
Heather A. Bjella
McANDREWS, HELD & MALLOY LTD.
500 West Madison Street, Suite 3400
Chicago, Illinois 60661
Telephone: (312) 775-8000
Facsimile: (312) 775-8100

**Attorneys for Plaintiff**
**CSP Technologies, Inc.**